1997 ME 222

## NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY d/b/a NYNEX

v.

## PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued Oct. 10, 1997.
Decided Nov. 24, 1997.

---

Gerald M. Amero (orally), William D. Hewitt, Pierce Atwood, Portland, Donald W. Boecke, New England Tel. & Tel. Co., Boston, MA, for plaintiff.

Joanne B. Steneck (orally), General Counsel, Maine Public Utilities Commission, Augusta, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1] NYNEX appeals from an order of the Public Utilities Commission adopting a rule that requires a 20% reduction in intrastate access charges.[1] NYNEX argues that the Commission's rulemaking order violated the Commission's Alternative Form of Regulation ("AFOR") order by reducing the intrastate access charges without an offsetting adjustment to make the rate change revenue-neutral.[2] NYNEX argues that the order altered the revenue base provided in the AFOR order, thereby violating NYNEX's right to a fair rate of return, due process, and nonconfiscatory rates. Alternatively, NYNEX argues that the Commission is without authority to affect the rates by rulemaking. Finding no error, we affirm.

[¶ 2] NYNEX is currently regulated by an AFOR order dated May 15, 1995, adopted pursuant to the AFOR Act, 35-A M.R.S.A. §§ 9101–9105 (Supp.1996). The AFOR order is an alternative to the traditional rate-base/rate-of-return order. The AFOR has a five-year term and is designed to provide incentives for NYNEX to achieve greater efficiency and lower prices for telephone services.

[¶ 3] On October 24, 1996, the Commission issued a notice of rulemaking to all interested parties and requested comments. The Commission proposed a comprehensive revision of Chapter 280 of the Commission's rules governing competitive telecommunications services, and alternatively proposed to reduce intrastate access charges on an interim basis and delay consideration of the contemplated comprehensive revisions until the Federal Communications Commission concluded its review of interstate access charges. The notice stated that the proposed alterna-

---

1. Access charges are the amount interexchange telephone carriers must pay for the use of the local exchange carrier's network to complete intrastate toll calls. In effect, access rates are wholesale rates for long distance calls.

2. A revenue-neutral change means that the overall revenue base of a utility is not affected—if one rate is reduced, another rate is increased to offset the reduction so that the total revenue base does not change.

tive interim plan would immediately reduce the per-minute originating common line charge by 20%. The common line charges are the principal component of intrastate access charges. Comments were received by the Commission from interested parties, including extensive comments from NYNEX concerning the impact of the changes and suggestions for making the changes revenue-neutral.

[¶ 4] After reviewing the comments, the Commission issued on June 10, 1997, an Order Adopting Rule and Statement of Factual and Policy Basis, in which it reduced the per-minute originating common line charge by 20% without offsetting changes to make it revenue-neutral. After reconsideration, the Commission denied NYNEX's request to amend the Order, and NYNEX now appeals pursuant to 35–A M.R.S.A. § 1320 (1988).

[¶ 5] NYNEX first argues that the rule reducing access charges by 20% violated the terms of the AFOR order. We disagree. The AFOR order was adopted by the Commission pursuant to the following statute:

> The commission may adopt ... an alternative form of regulation for any telephone utility in the State. The alternative form of regulation must conform to the requirements of chapter 71 [35–A M.R.S.A. §§ 7101–7105] ... but need not conform with chapter 3 [35–A M.R.S.A. §§ 301–313] to the extent that the provisions of chapter 3 require the use of rate-base, rate-of-return or any other specific form of regulation of the rates of a telephone utility or to the extent that the provisions of chapter 3 give any party, including the telephone utility, the right to petition to change rates for telecommunications services. This chapter may not be construed to limit the authority of the commission under section 1322.

35–A M.R.S.A. § 9102 (Supp.1996).

[¶ 6] The order explicitly prohibits the filing of rate cases by NYNEX, and prohibits the Commission from initiating a rate investigation against NYNEX during the term of the order:

> NYNEX will not be able to file annual rates cases; it cannot rely on rate increases to catch up with whatever costs it incurs; to earn a reasonable return on its investment, it must achieve cost levels consistent with the Price Regulation Index (PRI).
>
> The Commission will not initiate rate investigations against NYNEX for at least five years. If NYNEX increases its sales or reduces its costs by more than the PRI, it keeps the extra profits....

The AFOR Act establishes that the period of the alternative form of regulation "may not be less than 5 years nor exceed 10 years," 35–A M.R.S.A. § 9103(1) (Supp.1996), and provides that the utility must be entitled to a fair rate of return over the period of the AFOR. 35–A M.R.S.A. § 9103(6) (Supp.1996). The AFOR order acknowledged that, "[t]he price cap formula we adopt today, based on reasonably expected or attainable cost changes, will give NYNEX a reasonable opportunity to recover all of its reasonable costs, including a fair return on its local and toll investment." The AFOR order established a "starting point revenue base" for establishing a fair rate of return to NYNEX in a contemporaneous rate case, *Pease v. New England Tel. and Tel. Co.*, 162 P.U.R. 4th 110 (Me.P.U.C.1995).

[¶ 7] A change to the revenue base undoubtedly affects NYNEX's opportunity to earn a fair return. The AFOR order, however, reserved to the Commission the power to change the access rates in the following terms:

> [B]eyond including the rates under the non-discretionary core services category, we do not address the issues of interconnection or access charge structure or rates in this proceeding. Interexchange access charges and structure are presently governed by existing chapter 280.
>
> . . .
>
> Subject to any change that occurs as a result of a revision of Chapter 280, access charges will be subject to the same price cap rules as toll rates.

The AFOR order also provided in the section entitled "Access charges" that:

> [o]ur current Chapter 280 rule will control the rates of existing access elements ...

At least for the present, the common line charge rate will continue to be based directly on NYNEX's retail toll rates, as required by Chapter 280, § 8 . . . If Chapter 280 is revised to require local access elements, those rates will also be included in the nondiscretionary core services category.

[¶ 8] Although the revision of Chapter 280 affects NYNEX's revenue base and may undercut the incentive goals of the AFOR order, the language of the order explicitly anticipates and permits changes to Chapter 280. We conclude that the Commission did not violate the AFOR order, and NYNEX was not deprived of due process.

[¶ 9] NYNEX next argues that any proceeding that has the effect of reducing a utility's rates is required by 35–A M.R.S.A. §§ 1302–1304 (1988) to be brought pursuant to the adjudicatory hearing provisions of the Administrative Procedures Act (5 M.R.S.A. §§ 9051–9064 (1989 & Supp.1996)). Because the rulemaking in this case did not involve an adjudicatory hearing, they argue that they were deprived of due process. Maine's public utility law neither explicitly nor implicitly requires an adjudicatory hearing in these circumstances. The sections of the law referred to by NYNEX establish the procedure for a rate case, but they do not shield rates from the impact of other forms of administrative action. We reject NYNEX's argument and we conclude that it is lawful for rulemaking proceedings to affect rates, and that the subject revisions to Chapter 280 are within the authority of the Commission.

[¶ 10] We have previously examined the distinction between a rulemaking proceeding and an adjudicatory proceeding. In a case involving the Maine Milk Commission we held that "the administrative functions and processes involved in price fixing are more closely similar to those that are typical of rulemaking than to those that are typical of

adjudication." *Cumberland Farms Northern, Inc. v. Maine Milk Comm'n,* 428 A.2d 869, 874 (Me.1981) (citing generally *Cambridge Elec. Light Co. v. Department of Pub. Util.,* 363 Mass. 474, 485–87, 295 N.E.2d 876, 883–85 (1973)) (Department could adopt a regulation rather than conduct adjudicatory procedures to fix the rate of interest to be paid by utilities upon deposits made by their customers where it could not be fittingly described to determine particular legal interests of specifically identified persons). We reasoned that "[c]haracteristically, in comparison with most adjudicatory proceedings, price setting involves the agency in a wider range of independent investigation to determine facts and in a more complex balancing and reconciliation of interrelated interests, both public and private, to arrive at its conclusions." *Id.* Even though our opinion in *Cumberland Farms* rises out of a very different administrative context, it conclusively negates the argument that the rulemaking process may never affect rates. The revision to Chapter 280 applies to all interexchange carriers, and was adopted to encourage competition and to create lower rates for certain telephone services.

[¶ 11] With regard to the Commission's authority, the law requires that "every public utility must provide safe, reasonable, and adequate facilities and service" and rates that are "just and reasonable." 35–A M.R.S.A. § 301 (1988). The Legislature has specifically provided that "it is the policy of the state that telephone service must continue to be universally affordable, especially to the poor at affordable rates," 35–A M.R.S.A. § 7101(1) (Supp.1996), and that "a modern state-of-the-art telecommunication network is essential for the health and vitality of the state and the improvement in the quality of life for all of Maine citizens." 35–A M.R.S.A. § 7101(2) (Supp.1996).[3] The Commission has "all implied and inherent powers under this Title, which are necessary and proper to execute faithfully its express powers and

---

**3.** In addition, the Commission's final action was influenced by a legislative directive that it lower intrastate access rates to match interstate access rates. The directive was enacted by P.L.1997, ch. 259 (An Act to Require the Public Utilities Commission to Align Telecommunication Carrier

Access Rates with Costs to Foster Economic Development and Competition Throughout the State) before the Commission issued its rulemaking order. The directive became effective on September 17, 1997 and is presently codified as 35–A M.R.S.A. § 7101–B (Supp.——).

functions." 35–A M.R.S.A. § 104 (1988). In this case, the Commission exercised its authority in an effort to make telecommunications more affordable and lawfully resorted to the rulemaking process in order to achieve that objective. NYNEX fails to demonstrate a denial of due process.

The entry is:

Judgment affirmed.

